AUTO GLASS EXPRESS, INC. *v*. HANOVER
INSURANCE COMPANY

ED STEBEN GLASS COMPANY, INC. *v*. HANOVER
INSURANCE COMPANY
(SC 18118)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued April 30—officially released August 25, 2009

*Charles J. Lloyd,* pro hac vice, with whom was *Richard Preston,* for the appellants (plaintiffs).

*Charlene M. Russo,* for the appellee (defendant).

*Opinion*

ROGERS, C. J. In these actions for breach of contract, the plaintiffs, Auto Glass Express, Inc. (Auto Glass) and Ed Steben Glass Company, Inc. (Ed Steben), appeal[1] from the judgments of the trial court, in favor of the defendant, Hanover Insurance Company. The primary issue we must decide is whether the trial court properly concluded that the plaintiffs' actions constituted acceptance of the defendant's offers regarding the prices that the plaintiffs were entitled to receive as reimbursement for performing certain repairs to automobiles insured by the defendant. On appeal, the plaintiffs claim that their actions did not result in the formation of unilateral

[1] The plaintiffs appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

contracts with the defendant and that, as assignees of the defendant's policyholders, they are entitled to reimbursement according to the terms of the insurance policies issued by the defendant. The plaintiffs further claim that the terms of the insurance policies entitled them to receive reimbursement for the full amount of the invoices that they had submitted to the defendant. We agree with the plaintiffs that unilateral contracts were not formed and, accordingly, reverse the judgments of the trial court.

The following facts and procedural history, which are not in dispute, inform our disposition of the plaintiffs' appeal. The defendant entered into automobile insurance contracts with various policyholders. The relevant terms of those insurance contracts provide for reimbursement of the "amount necessary to repair or replace [broken] glass with other [glass] of like kind and quality."

The plaintiffs are automobile glass repair companies doing business in Connecticut. During the years 2000 through 2003, the defendant periodically issued letters to the plaintiffs (pricing letters) in order to "facilitate timely payment of invoices and avoid misunderstandings . . . ." The pricing letters informed the plaintiffs of the defendant's "pricing standards" for glass repair services, which were "not the lowest available" to the defendant but reflected the defendant's estimate of "fair and reasonable prices for the market." According to the letters, each pricing list "[superseded] any prior pricing agreements with [the defendant]." The pricing letters further stated: "Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted."[2]

---

[2] The pricing letter sent by the defendant, addressed to Ed Steben and dated April 29, 2002, provides in relevant part:

"Dear Shop Owner/Manager:

"We continue to appreciate the glass service you are providing to our . . . [policyholders]. To facilitate timely payment of invoices and avoid

Between April 5, 2000, and July 23, 2004, the plaintiffs repaired automobile glass for several of the defendant's policyholders. In exchange for the glass repair work, the policyholders assigned to the plaintiffs their rights of reimbursement from the defendant. The plaintiffs subsequently submitted invoices for the glass repair work to the Safelite Glass Corporation (Safelite), the defendant's third party administrator. On behalf of the defendant, Safelite thereafter reimbursed the plaintiffs by checks written in amounts that were consistent with the amounts set forth in the pricing letters, but were less than the amounts submitted in the plaintiffs' invoices. Safelite attached to each check an explanation of benefits form that included the words "FAIR AND REASONABLE PAYMENT" or "REASONABLE & CUSTOMARY ADJ." after the defendant's name.[3] The plaintiffs promptly negotiated the checks that they had received from the defendant.

---

misunderstandings, we are informing you of [the defendant's] updated pricing standards. These prices are not the lowest available to us, however, we believe they represent fair and reasonable prices for the market.

"The pricing structure along with your shop listing is attached and is effective May 8, 2002.

"The prices listed [supersede] any prior pricing agreements with [the defendant].

"Safelite Glass Corp[oration] is administering our glass program. Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted. Send invoices to [the defendant] . . . .

"We look forward to working with you in providing glass service to our [policyholders]. If you have any questions, please call . . . to speak with Safelite Glass Corporation."

The other pricing letters contained minor variations in the text that did not alter the substance of the letters and are not relevant to the issues presented in this appeal.

[3] Safelite served as the third party administrator for various insurance companies in addition to the defendant. Accordingly, Safelite frequently tendered to the plaintiffs, on behalf of multiple insurers, a single reimbursement check in the aggregate amount due for several repairs. The explanation of benefits itemized the individual amounts tendered for each repair, identifying the insurance company, policyholder and invoice number associated with each amount.

The plaintiffs initiated the actions underlying this appeal alleging that the defendant had breached its insurance contracts by failing to pay the full amount of the invoices submitted to it by the plaintiffs.[4] The defendant asserted three special defenses, including accord and satisfaction and implied contract.[5]

After an evidentiary hearing on July 20 and 21, 2004, the trial court, *Sferrazza, J.*, without deciding whether the defendant had breached the insurance contract, found that the defendant had proven its special defense of accord and satisfaction. Accordingly, the trial court rendered judgments in favor of the defendant, from which the plaintiffs appealed to the Appellate Court.

The Appellate Court reversed the judgments of the trial court, concluding that the trial court improperly had found that the defendant had tendered the reimbursement checks as full satisfaction of the plaintiffs' claims.[6] *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*,

[4] The plaintiffs initiated eleven actions in small claims court. Auto Glass is the plaintiff in one of the underlying actions, Docket No. CV-03-0083842-S, and Ed Steben is the plaintiff in the other ten underlying actions. The defendant subsequently moved to transfer the cases to the regular docket of the Superior Court; see Practice Book § 24-21; and the cases later were consolidated for trial on the complex litigation docket.

[5] In Docket No. CV-03-0083842-S, in which Auto Glass is the plaintiff, the defendant asserted a third special defense of collateral estoppel, which it subsequently withdrew. In each of the ten cases initiated by Ed Steben, the defendant asserted as its third special defense that Ed Steben lacked standing because the policyholders had failed to effectuate valid assignments of their rights under the policies. The trial court found that the assignments were valid, and the defendant has not challenged that finding. The plaintiffs' standing is therefore not an issue in this appeal. See *BRT General Corp.* v. *Water Pollution Control Authority*, 265 Conn. 114, 117 n.5, 826 A.2d 1109 (2003).

[6] In support of its conclusion, the Appellate Court included a footnote stating: "The [pricing] letters themselves did not condition the payment of claims on their being full and final settlement; in fact, the letters stated only that '[b]ills that are accurate and are not more than this pricing structure will be paid promptly as submitted.' The letters were silent about bills that were more than the allowable claims. The letters, therefore, do not evidence an intention on the part of the defendant not to pay a greater amount, but rather an intention not to pay a greater amount 'promptly.'" *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 98 Conn. App. 784, 794 n.6, 912 A.2d 513 (2006), cert. denied, 281 Conn. 914, 916 A.2d 55 (2007).

98 Conn. App. 784, 794–95, 912 A.2d 513 (2006), cert. denied, 281 Conn. 914, 916 A.2d 55 (2007). The Appellate Court therefore remanded the consolidated cases to the trial court for further proceedings on the plaintiffs' breach of contract claims and the defendant's remaining special defenses of implied contract.[7] Id., 796.

On remand, the trial court found that the pricing letters constituted offers from the defendant to pay for glass repairs to automobiles insured by the defendant and that the plaintiffs had accepted those offers each time that they had performed those glass repairs, thereby consummating a series of unilateral contracts between the parties.[8] The trial court further found that the terms of the pricing letters had supplied the amounts that were "necessary" to repair glass under the insurance policies assigned to the plaintiffs by the defendant's policyholders. Accordingly, the trial court concluded that the defendant had not breached the insurance contracts. The trial court therefore rendered judgments in favor of the defendant. This appeal followed.

---

[7] "The term implied contract . . . often leads to confusion because it can refer to an implied in fact contract or to an implied in law contract. An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties. . . . On the other hand, an implied in law contract is not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation . . . . It is based on equitable principles to operate whenever justice requires compensation to be made. . . . An implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party. . . . Accordingly, an implied in law contract is another name for a claim for unjust enrichment." (Citations omitted; internal quotation marks omitted.) *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 573–74, 898 A.2d 178 (2006). In the present case, it is clear from the pleadings, evidence and arguments submitted by the defendant that its special defense alleged an implied in fact contract.

[8] In the case of a unilateral contract, "the offeror invites acceptance of his promise not by a reciprocal promise, but by performance." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 13 n.4, 662 A.2d 89 (1995).

## I

The plaintiffs first claim that the trial court improperly found that their performance of repairs to automobiles insured by the defendant resulted in the formation of unilateral contracts between the parties. In support of their claim, the plaintiffs argue that: (1) the pricing letters failed to convey offers by the defendant; (2) the plaintiffs' performance of glass repairs did not constitute their acceptance of any such offers; and (3) any agreement between the parties lacked consideration under the preexisting duty rule. We agree with the plaintiffs' argument that their performance of glass repairs did not constitute acceptance of the terms of the pricing letters.

Before we address the merits of the plaintiffs' claim, we set forth our standard of review. "It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. . . . The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." (Internal quotation marks omitted.) *MD Drilling & Blasting, Inc.* v. *MLS Construction, LLC*, 93 Conn. App. 451, 454, 889 A.2d 850 (2006); see also *Otto Contracting Co.* v. *S. Schinella & Son, Inc.*, 179 Conn. 704, 709, 427 A.2d 856 (1980) ("whether a contractual commitment has been undertaken is ultimately a question of the intention of the parties").

Ordinarily the parties' intent is a question of fact. *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007). Where a party's intent is expressed clearly and unambiguously in writing, however, "the determination of what the parties intended . . . is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) Id.; see also *Mercer Electric Mfg. Co.* v. *Connecticut*

*Electric Mfg. Co.*, 87 Conn. 691, 694, 89 A. 909 (1914) (interpretation of party's written offer legal question to be decided by court). "The intent of the parties as expressed in [writing] is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]. . . . Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a [written instrument] must emanate from the language used in the [writing] rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, 279 Conn. 90, 109–10, 900 A.2d 1242 (2006).

In the present case, the trial court found that the pricing letters conveyed offers by the defendant, that the offers "invited acceptance, not by a reciprocal promise by the plaintiffs, but by their performance" and that the plaintiffs "accepted the offers by their performance every time they installed or repaired the glass in [automobiles insured by the defendant]."[9] We agree with the trial court's finding that the pricing letters conveyed to the plaintiffs offers that invited acceptance through performance. We disagree, however, that the performance of glass repairs, without more, constituted acceptance of the terms set forth in the pricing letters.

---

[9] "An offer may propose the formation of a single contract by a single acceptance or the formation of a number of contracts by successive acceptances from time to time." 1 Restatement (Second), Contracts § 31 (1981).

The rules governing contract formation are well settled. "This court has long held that an offer imposes no obligation upon either party, until it is accepted by the offeree, according to the terms in which the offer was made. . . . Our holdings adhere to the basic principle of contract law that an offeror is the master of his offer, and therefore, is not obligated to make an offer on any terms except his own." (Citations omitted.) *Daddona* v. *Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 256, 550 A.2d 1061 (1988). Thus, "[a]n offer can be accepted by the rendering of a performance only if the offer invites such an acceptance." 1 Restatement (Second), Contracts § 53 (1) (1981). Further, "[i]n order to accept the offer [by rendering performance], the offeree must give . . . that for which the offeror bargains. If it is in any material respect different, there is no contract." 1 A. Corbin, Contracts (Rev. Ed. 1993) § 3.34, p. 484; see also *Ocean Ins. Co.* v. *Carrington*, 3 Conn. 357, 361–62 (1820) (concluding that plaintiff failed to accept defendant's proposal for insurance on twenty-six horses valued at $2200 and twenty oxen valued at $800 by underwriting policy on forty-six head of horses and oxen valued at $3000); 1 Restatement (Second), supra, § 58 (acceptance must comply with requirements of offer as to promise to be made or performance to be rendered). Accordingly, in order to determine whether the plaintiffs accepted the defendant's offers, we first must determine whether the relevant glass repairs constituted the performance sought by those offers.

"In the making of any bargain, the party making the 'offer' is proposing an exchange. . . . To determine what this proposed exchange is, we must interpret the words and acts of the offeror." 1 A. Corbin, supra, § 3.34, p. 484; see also *Ocean Ins. Co.* v. *Carrington*, supra, 3 Conn. 361 (existence of contract depends on construction of offeror's proposal). We therefore must examine

the language of the pricing letters in order to determine the scope of the exchange intended by the defendant. If the pricing letters clearly and unambiguously set forth the performance sought by the defendant, we need not look beyond those written words to ascertain the defendant's intent. See *Connecticut Light & Power Co.* v. *Lighthouse Landings, Inc.*, supra, 279 Conn. 109–10; *Mercer Electric Mfg. Co.* v. *Connecticut Electric Mfg. Co.*, supra, 87 Conn. 694.

According to the plain language of the pricing letters, the only exchange proposed by the defendant is its promise to pay bills *timely* in exchange for the submission of bills that do not exceed its proposed pricing structure: "Bills that are accurate and are not more than this pricing structure will be paid promptly as submitted." In fact, the pricing letters, read as a whole, reinforce this interpretation. *Office of Labor Relations* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 288 Conn. 223, 232, 951 A.2d 1249 (2008) ("[w]hen interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result" [internal quotation marks omitted]). The very first paragraph of the pricing letters sets forth the purpose of the letters, namely, "[t]o facilitate *timely* payment of invoices and avoid misunderstandings . . . ." (Emphasis added.)

Moreover, nothing in the language of the pricing letters, either expressly or impliedly, suggests that the mere performance of glass repairs on automobiles insured by the defendant was sufficient to bind the plaintiffs to the defendant's prices. The pricing letters also do not indicate how the defendant intended to address invoices that did not conform to its pricing standards. The defendant's statement that its pricing structure represented what it believed to be "fair and reasonable prices for the market" failed to convey any

intent that higher prices were unfair or unreasonable and would not be paid. Thus, we agree with the Appellate Court's observation that "[t]he [pricing] letters, therefore, do not evidence an intention on the part of the defendant not to pay a greater amount, but rather an intention not to pay a greater amount 'promptly.' "[10] *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, supra, 98 Conn. App. 794 n.6; see also footnote 6 of this opinion. Further, the statement in the pricing letter that "[t]he prices listed [superseded] any prior pricing agreements," sheds no light on what performance was required in order to accept the defendant's new price terms. Because the plain language of the pricing letters clearly and unambiguously required the plaintiffs to submit invoices that reflected the pricing standards set forth in those letters in order to accept the defendant's offer of timely payment, and did not restrict the plaintiffs from submitting invoices reflecting higher prices, we need not look beyond the pricing letters to ascertain the defendant's intent.[11]

---

[10] The defendant argues that *Cascade Auto Glass, Inc.* v. *Progressive Casualty Ins. Co.*, 135 Wash. App. 760, 145 P.3d 1253 (2006), review denied, 161 Wash. 2d 1012 (2007), on which the trial court relied, compels a different conclusion. We disagree. In *Cascade Auto Glass, Inc.*, the Court of Appeals of Washington concluded that the defendant had presented offers to the plaintiff to enter into unilateral contracts, which the plaintiff had accepted each time it repaired automobile glass for the defendant's policyholders. Id., 769. In reaching its conclusion, the court conducted no analysis of the text of the defendant's offers; id.; and, therefore, it is not clear that the text of those offers matched the text of the pricing letters in this case. Accordingly, we do not find *Cascade Auto Glass, Inc.*, to be particularly persuasive.

[11] Even if we did agree with the defendant that the pricing letters invited acceptance of its prices merely by the performance of glass repairs, the defendant failed to prove that the plaintiffs' conduct objectively manifested acceptance of the defendant's offers. An offer inviting acceptance via performance "does not limit the offeree's freedom of action or inaction; he may act or forbear without reference to the offer." 1 Restatement (Second), supra, § 53, comment (b). The offeree therefore may rebut the presumption of acceptance "if within a reasonable time the offeree exercises reasonable diligence to notify the offeror of non-acceptance." 1 Restatement (Second), supra, § 53 (2); see also 2 S. Williston, Contracts (4th Ed. 2007) § 6:4, pp. 30–32.

In light of the clear and unambiguous language of the pricing letters, we conclude that, in order for unilateral contracts to have been formed, the plaintiffs would have been required to accept the prices stated in those letters by submitting invoices that conformed to those prices. The plaintiffs did not submit conforming invoices, and, therefore, the trial court improperly concluded that the parties had formed a series of unilateral contracts that supplied the amounts due from the defendant under the assigned insurance policies. Accordingly, the defendant has not sustained its burden of proving its special defense of an implied in fact contract.

II

The issue that remains is whether the plaintiffs have sustained their burden of proving that the defendant had breached the terms of the insurance policies assigned to the plaintiffs by refusing to pay the amounts stated in the plaintiffs' invoices. Because the trial court made no findings with respect to the plaintiffs' breach of contract claims, independent of its finding that unilateral contracts had been formed, we must remand the cases for

In the present case, the plaintiffs performed glass repairs and promptly sent to the defendant invoices requesting payment in amounts greater than the amounts set forth in the pricing letters. Because the defendant received notice of the plaintiffs' requested reimbursement at the same time it received notice that the plaintiffs had rendered the requested performance, it was not objectively reasonable for the defendant to conclude that its offer had been accepted. See *Pleines* v. *Franklin Construction Co.*, 30 Conn. App. 612, 617, 621 A.2d 759 (1993); see also 1 E. Farnsworth, Contracts (3d Ed. 2004) § 3.7, p. 213 n.2 ("party's intention not to be legally bound prevails if it is actually known to the other party, regardless of what the other party might have reason to know").

Judge Berger rejected the plaintiffs' argument that they had expressed something less than acceptance by submitting an invoice that exceeded the defendant's pricing standards and bringing an action against the defendant for the difference, on the ground that the plaintiffs had waived or abandoned that argument by failing to brief it before the trial court. The plaintiffs, however, distinctly raised their argument in their September 10, 2004 reply to the defendant's posttrial memorandum to the trial court. Accordingly, we conclude that the plaintiffs neither waived nor abandoned it.

further findings by the trial court. The parties urge this court, however, to provide the trial court with some guidance by construing as a matter of law the language in the insurance contracts. Because the interpretation of the policy language "amount necessary" presents an issue of law; *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 174, 713 A.2d 1269 (1998); that inevitably will arise on remand, we conclude that guidance to the trial court is appropriate in this case. See *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 164, 971 A.2d 676 (2009) (this court will address issue unnecessary to resolution of appeal when issue likely to arise on remand); see also *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 641–42, 866 A.2d 588 (2005) (addressing whether deed entitled power company to assign less than entirety of easement rights to third party); *New Haven Water Co.* v. *Board of Tax Review*, 178 Conn. 100, 115, 422 A.2d 946 (1979) (addressing contours of capitalization of net income method for valuation of plaintiff's forest land, in order to determine "current use" under General Statutes § 12-63).

"[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . It is the function of the court to construe the provisions of the contract of insurance. . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the

insured . . . ." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Fontaine,* 278 Conn. 779, 784–85, 900 A.2d 18 (2006).

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." (Internal quotation marks omitted.) *National Grange Mutual Ins. Co.* v. *Santaniello,* 290 Conn. 81, 89, 961 A.2d 387 (2009).

The plaintiffs maintain that the "amount necessary," as used in the context of the assigned insurance policies, means an amount that is reasonable in the marketplace. In support of their interpretation, the plaintiffs cite *Glass Service Co.* v. *Progressive Specialty Ins. Co.,* 603 N.W.2d 849, 852 (Minn. App. 2000), in which the Court of Appeals of Minnesota interpreted insurance policy language that is materially indistinguishable from the language used in the present case and concluded that "the amount 'necessary' to replace a windshield with one of like kind and quality is a price that is reasonable in the marketplace." The defendant, citing *New England Pipe Corp.* v. *Northeast Corridor Foundation,* 271 Conn. 329, 336–37, 857 A.2d 348 (2004), counters that the "amount necessary" is the "amount absolutely required or essential to have the service performed."

We conclude that the language "amount necessary" is ambiguous. As the defendant correctly observes, we stated in *New England Pipe Corp.* v. *Northeast Corridor Foundation,* supra, 271 Conn. 336–37, that "Webster's Third New International Dictionary defines the term

'necessary' as '[something] that cannot be done without: that must be done or had: absolutely required: essential, indispensable . . . .' " Black's Law Dictionary (6th Ed. 1990), however, notes that the term "[n]ecessary" also "may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." The split of authority on this very point between *Glass Service Co.* v. *Progressive Specialty Ins. Co.*, supra, 603 N.W.2d 851–52, which interpreted materially identical insurance contract language, and *New England Pipe Corp.* v. *Northeast Corridor Foundation*, supra, 336–37, which involved the construction of a statute, exemplifies the reasonableness of both parties' interpretations. See *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, supra, 278 Conn. 787. The language of the assigned insurance policies is therefore reasonably susceptible to both parties' interpretations and is ambiguous. It is well settled that "any ambiguity is resolved in favor of the insured." (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 796, 967 A.2d 1 (2009). We therefore construe the "amount necessary" language contained in the policies to mean an amount that is reasonable in the marketplace.

The trial court made no findings as to what amounts were reasonable in the marketplace to "repair or replace [broken] glass with other [glass] of like kind and quality." Consequently, we must remand the cases to the trial court to decide whether the plaintiffs' invoices were reasonable in the marketplace and whether the defendant breached the terms of the insurance policies by failing to pay the full amount of the invoices.

The judgments are reversed and the cases are remanded for further proceedings according to law.

In this opinion the other justices concurred.